Filed 9/12/24  P. v. Bridgette CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062195 |
| v. | (Super. Ct. No. 16WF2665) |
| THOMAS ANDRE BRIDGETTE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge. Affirmed in part, reversed in part, and remanded.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Thomas Andre Bridgette was convicted of sexually assaulting two different women on two separate occasions in the fall of 2016. On appeal, he contends 1) the trial court erred in failing to suppress incriminating evidence that was seized during a warrantless search of his home, 2) the trial court erred in denying his request for a separate trial as to each victim, and 3) the jury instruction on the use of propensity evidence was fundamentally unfair. Although we find these contentions unpersuasive, defendant also raises a narrow sentencing issue that, as respondent concedes, does have merit. Therefore, we will reverse one aspect of his sentence and remand the matter for limited resentencing. In all other respects, we affirm the judgment.

## STATEMENT OF FACTS

*Incident Involving Jane Doe 2 (JD2)*

In 2016, JD2 was a young single mother living with her parents in Anaheim. Hoping to find a place of her own, she joined a Facebook group designed to help people locate room rentals in Orange County. Defendant contacted her through the group on October 1, 2016. At his request, she agreed to meet him at a Jack in the Box restaurant later that day to discuss a property he supposedly had for rent.

During the meeting, defendant said he had a pool-house studio that he was looking to rent for $600 a month, and after seeing pictures of the alleged property on his phone, JD2 said she was interested. She even offered to give defendant half of the first month's rent as a down payment. However, rather than closing the deal with JD2 at that point, defendant suggested that they meet back at the restaurant in a couple hours to discuss the matter further, and she agreed to do so.

2

When JD2 returned to the restaurant that afternoon, she brought along her four-year-old daughter. Defendant arrived in a blue Toyota pickup truck. He offered to take JD2 to see the studio, and because defendant "looked harmless" to her, she got in his truck with her daughter. However, instead of taking them to see the studio, defendant drove to a Home Depot store in Garden Grove.

Upon pulling into the parking lot, defendant stopped his truck and told JD2 he was a federal drug agent. Although defendant was not actually associated with law enforcement, JD2 believed he was a police officer because he showed her an official looking card and spoke in an authoritative manner. She also noticed he had a pair of handcuffs with him at that point.

Defendant told JD2 he had been trying to track her down for some time. He then began questioning her about some murder case that was supposedly connected to the pool-house studio. JD2 had no idea what defendant was talking about. However, when she tried to tell him that, he told her he was going to have to take her to the Fullerton police station for additional questioning.

Still thinking defendant was a police officer, JD2 asked him if they could drop off her daughter at her parents' house first, and he agreed to do so. On arrival at the house, defendant told JD2 that if she did not return to his truck after taking her daughter inside, he was going to come into the house and arrest her. So, she entered the house, left her daughter with her mother, and promptly returned to defendant's truck. Then they headed back out on the road together.

As they were driving, defendant made a phone call to a female and asked her to bring him his gun. He also asked JD2 to hand him a cigarette package that was in the truck. However, when she handed him the

package, she noticed it did not have any cigarettes inside. Defendant told her the package contained methamphetamine, and now that her fingerprints were on it, he could have her arrested for drug possession. Fearing defendant was a crooked cop, JD2 became very worried. Her anxiety only increased when she realized defendant was not driving in the direction of the Fullerton police station.

Instead of taking JD2 to the station, defendant took her to a quiet alley in Buena Park, where he stopped his truck and put her in the handcuffs. When she tried to escape, defendant grabbed her hair and slammed her head into the center gear shifter. Then he pulled out a switchblade-like knife, held the blade up to her neck, and asked her how bad she wanted to go home. JD2 took that to mean defendant wanted something from her. Although she begged him to let her go, he told her the only "easy way" out was for her to give him oral sex.

When JD2 refused, defendant forcibly kissed her and grabbed her breasts and vagina over her clothing. Then he tried to reach underneath her clothing, but JD2 successfully resisted that attempt by squirming around and fighting back the best she could. She also tried to yell for help, however, defendant covered her mouth and continued to pull her hair and rough her up. Out of desperation, JD2 made an appeal to defendant's religious faith and promised not to tell anyone about their encounter if he would only let her go. At that point, defendant finally relented and agreed to take JD2 back to her parents' house.

As he was dropping her off, he removed her handcuffs and gave her $20 to buy a pizza for her daughter. He also told her to delete all of the messages that they had exchanged about the room rental that day. However, JD2 did not do that, nor did she keep quiet. Instead, she proceeded to tell her

4

parents what defendant had done to her. As it turned out, her father did not believe her, and her mother was skeptical of her story. So, she called a friend and told her about the ordeal. JD2 does not remember who called the police, but Garden Grove Police Officer Jane Raney came out to talk to her at her parents' house at about 11:45 that evening.

After briefly speaking with JD2 at the house, Raney took her to the station for further questioning. JD2 told Raney that in addition to pulling a knife on her and pressuring her for oral sex, defendant had threatened to tase her and spray her with pepper spray. She also claimed that defendant punched her in the side of the head during the attack.

Following the interview, JD2 identified defendant from a photographic lineup. She also turned over a cell phone to the police, but it was not the one she had used to communicate with defendant about the room rental. And although the police drove her around the area where she said that defendant had attacked her, she could not identify the precise location where the attack occurred.

Nevertheless, the police obtained a warrant to search defendant's home in Garden Grove. During the search, they found a box of .22 caliber ammunition, a fake police badge, and a box for a stun gun. And inside defendant's pickup truck, they found pepper spray, handcuffs and a switchblade-like knife. Both the pepper spray and the handcuffs had JD2's DNA on them.

Defendant waived his *Miranda* rights and agreed to be interviewed. (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) At first, he denied knowing JD2 or communicating with her about any room rental. But after the police showed him surveillance photos of them together at the Jack in the Box, he admitted "hitting her up" on Facebook and meeting

5

her there to discuss property rentals. He also admitted driving JD2 to the parking lot of Home Depot. However, he insisted that she went along with him willingly and that he never told her he was a police officer. He also claimed that he never handcuffed her, demanded sex from her, or hurt her in any way. Rather, according to defendant, he was just trying to help her out by finding her a place to stay.

Following his interview, defendant was released pending further investigation. Less than six weeks later, he was involved in a second incident of alleged sexual misconduct that occurred on November 11, 2016.

*Incident Involving Jane Doe 1 (JD1)*

On that day, JD1 was working as a prostitute at the Quality Inn motel in Westminster. Sometime after 3:00 p.m., defendant called her about an advertisement for sexual services that she had placed online. JD1 gave defendant her location and then went to a nearby liquor store to get a bottle of water. When she returned to her room, she thought she closed the door behind her, but it was actually slightly ajar. She realized this a few minutes later when defendant abruptly entered her room with a gun and told her to take off her clothes. He also threatened to kill her if she screamed or made any loud noises.

After JD1 disrobed, defendant took off his pants and directed her to put on a black dress that was lying on the bed. But after she put it on, defendant told her to take it off and became violent. He grabbed a towel off the bed, wrapped it around JD1's neck, and pulled her hair. He also grabbed her breasts and buttocks and tried to kiss her. JD1 tried to resist and get away. However, defendant was too strong, and because he was choking her with the towel, she was having trouble breathing and could not yell for help.

6

Defendant eventually eased up with the choking. However, while still holding the gun, he demanded that JD1 suck his penis, or he would kill her and throw her in the bathtub. JD1 complied out of fear for her life. Defendant then pushed her onto the bed and tried to have intercourse with her. But he could not achieve an erection and was only able to penetrate her vagina slightly with his flaccid penis.

Defendant also put his fingers inside JD1's vagina momentarily and touched her anus. While doing so, he directed her to call him "daddy" and to tell "daddy" how much she wanted him. However, due to his inability to obtain an erection, he eventually gave up the cruel charade and ceased the attack.

As he was getting dressed, defendant warned JD1 not to call the police. He also picked up the bottle of water that she had purchased from the liquor store and threatened to kill her with it. But instead of doing that, defendant took JD1's phones—both her personal phone and her "business" phone—and left the room.

After that, JD1 went down to the lobby and called 911. Even though she was not able to identify defendant as her attacker at trial, surveillance videos captured defendant leaving the motel shortly before she called the police. Defendant's DNA was also found on JD1's neck and on the towel and the bottle of water that she described in her testimony. However, defendant's DNA was not found on JD1's genitals, and her DNA was not found on his penis.

When interviewed at the scene by members of the Westminster Police Department, JD1 was scared and nervous. Although she initially gave the police a false name and denied engaging in prostitution activity that day, she eventually admitted she was a sex worker. She said a man robbed her at

7

gunpoint in her room, pulling her hair and choking her with a towel. She also alleged that he digitally penetrated her vagina and anus and that he unsuccessfully tried to sodomize her. Consistent with her claim of being choked, JD1 had red marks—possibly scratches—on her neck. After photographing the marks, the police transported her to the hospital for a sexual assault examination.

The examination was performed by nurse Jennifer Rivera. Rivera did not observe any external injuries on JD1, but she did notice that she had a fresh bruise on the inside of her left cheek. The bruise was consistent with JD1 biting her cheek during some type of trauma, such as being strangled. JD1 also reported having head pain, trouble swallowing, and difficulty recalling the details of her attack, which was consistent with her claim of being choked.

While JD1 did not have any physical signs of strangulation in the area around her neck, and her voice did not sound hoarse or raspy, Rivera did not find that unusual. In fact, she said that roughly half of all assault victims who report being strangled do not have any physical manifestations of such abuse. Rivera also downplayed the lack of physical injury to JD1's genital area, saying that about three quarters of all rape victims show no signs of trauma in that area.

During the time that JD1 was speaking with the Westminster police and undergoing her examination, another important development in her case was beginning to unfold. The impetus for that development was JD1's boyfriend, A.M. On the night in question, he did not know anything about what had happened to JD1 or that defendant had stolen her phones. All he knew is that JD1 was not answering her phone or returning any of his numerous phone calls, which was very unusual for her. Eventually, he

became so worried about JD1 that he reported her to the police as a missing person.[1]

A.M.'s missing person's report came in at about 1:00 a.m. on November 12, 2016, roughly eight hours after JD1 was attacked by defendant in her motel room. A.M. told the authorities that by using a location finder app on his phone, he had been able to track JD1's phone to a residential neighborhood in Garden Grove. Fearing for JD1's wellbeing, he then drove to that neighborhood from his home in Los Angeles to look for her.

To assist A.M. in that endeavor, officers from the Garden Grove Police Department were dispatched to his location. When they arrived on the scene and contacted A.M., the officers did not know about the incident that had transpired earlier that evening between JD1 and defendant in Westminster. But based on previous contacts with defendant, they did know that he lived in the area where they met A.M. And with A.M.'s help, they were able to find JD1's phones, which were located in the backyard of defendant's rear neighbor. After finding the phones, the police contacted defendant at his home, and he agreed to talk to them about his encounter with JD1.

At the start of the interview, defendant claimed that nothing happened between him and JD1. But in response to further questioning, he admitted contacting JD1 through her ad and negotiating to have sex with her for $100. He said that when he arrived at JD1's motel room, he noticed she did not look like the woman who was pictured in her ad.[2] Nevertheless, he

---

[1] A.M. did not know that JD1 was a prostitute. She had told him that she worked as a mobile hairdresser.

[2] At trial, JD1 admitted she used the photo of another woman in her ad.

took off his clothes and washed his hands, in anticipation of having sex with her. However, at that point, JD1 raised her price to $250 and began rifling through his wallet, and therefore he decided to call things off before they had any sexual relations.

Defendant told the police that he did not have a gun with him during his encounter with JD1, nor did he attack her or hurt her in any way. But he did admit taking her phones because he was angry over the situation. He also admitted throwing the phones into his neighbor's backyard. The police arrested defendant and took him into custody. When interviewed at the station, he again denied attacking JD1.

Later that morning, the police conducted a consent search of defendant's residence and found a .22 caliber handgun in the garage. The gun was located in a pouch inside of a toolbox. Although the pouch was open and the toolbox was very dusty, the gun was clean. According to the officer who found it, the gun "did not appear that it had been sitting in there gathering dust and cobwebs, or anything like that."

In order to help the jury understand why JD1 might have been reluctant to tell the police she was a prostitute and to testify at trial (she testified under a grant of immunity), the prosecution called an expert witness on sex trafficking. He testified that prostitutes often use fake names and ad photos to conceal their identity. And because they work outside the confines of the law, they are highly vulnerable to exploitation and violence.

*The Defense*

The main witness for the defense was defendant's wife, L.M. She testified that at the time this case arose, she was defendant's girlfriend and was living with him, along with her mother, in a house in Garden Grove. She said she decided to marry defendant while his trial was pending because he is

10

honest and caring and would never do any of the things he was accused of doing.

Speaking to those accusations, L.M. said that when she had lunch with defendant on the day of the incident involving JD2, he told her that he was going to be helping a young woman and her daughter find a place to stay. That did not seem unusual to L.M., because she knew defendant as a kind and generous person. However, when she tried to contact defendant later that day—during the time that he was allegedly attacking JD2—he did not answer his phone or respond to any of her numerous text messages.

L.M. also testified that she owned the blue pickup truck that defendant was driving at the time he met up with JD2 and allegedly attacked her. L.M. claimed the pepper spray and the switchblade-like knife that the police found in the truck belonged to her. And, she also owned a small taser at that time. But she did not know anything about the handcuffs that were found in the truck.

In an attempt to discredit JD2's allegations, the defense also presented testimony from her father. Contrary to what JD2 said in her testimony, he said he was not at home on the day she was allegedly assaulted by defendant. He was also confronted with statements he allegedly made to a defense investigator impugning JD2's credibility and parenting skills.

Regarding the incident involving JD1, the defense presented evidence that, in speaking with her boyfriend A.M. about the incident, JD1 told him that defendant took her phones. But she did not say anything to him about defendant having a gun.

*Trial Proceedings*

As to JD1, defendant was charged with two counts of forcible sexual penetration with a foreign object and one count each of forcible rape,

11

forcible oral copulation, assault with the intent to commit a sex offense, and robbery. (Pen. Code, §§ 289, subd. (a)(1)(A); 261, subd. (a)(2); 288a, subd. (c)(2)(A); 220, subd. (a)(1) & 211, subd. (a).)[3] It was further alleged that defendant personally used a firearm during those offenses. (§ 12022.53, subd. (b).)

As to JD2, defendant was charged with kidnapping to commit a sex offense, sexual battery by restraint, assault with intent to commit a sex offense, and attempted forcible oral copulation. (§§ 209, subd. (b)(1); 243.4, subd. (a); 220, subd. (a)(1) & 664/287, subd. (c)(2)(A).) And he was alleged to have used a deadly weapon during the latter two crimes. (§ 12022.3, subd. (a).)

Prior to trial, the court denied defendant's request to sever the counts involving JD1 from the counts involving JD2, and therefore all of the charges were adjudicated in a single trial. In the end, the jury convicted defendant as charged and found all of the weapon enhancement allegations to be true. In a bifurcated proceeding, the trial court then found true additional allegations that defendant had suffered three prior strike convictions and three prior serious felony convictions. (§§ 667, subds. (d), (e)(2)(A); 1170.12, subds. (b), (c)(2)(A); 667, subd. (a)(1).) The trial court sentenced him to prison for 54 years and 4 months, plus an indeterminate term of 7 years to life.

## DISCUSSION

Defendant contends his convictions must be reversed for three reasons. First, the trial court erred by denying his motion to suppress the gun that was found in his garage. Second, the trial court erred by denying his

---

[3] Unless noted otherwise, all further statutory references are to the Penal Code.

request for a separate trial as to each of the victims. And third, the trial court erred in giving CALCRIM No. 1191B on the use of propensity evidence. For the reasons explained below, we find defendant's claims unconvincing. However, due to an undisputed sentencing error, he is entitled to resentencing on one of his offenses.

I.

SUPPRESSION MOTION

Before trial, defendant filed a motion to suppress the gun and any other incriminating evidence stemming from the warrantless search of his home on November 12, 2016. Although defendant, L.M., and L.M.'s mother each consented to the search, defendant maintained their consent was tainted by illegal police activity that proceeded the search. In particular, defendant accused the police of unlawfully entering his home while they were investigating the whereabouts of JD1.

At the motion hearing, the court heard from several police officers who were involved in that investigation, as well as L.M. The court also considered various statements that were picked up by the officers' body microphones while they were talking with L.M. and defendant at their home.

*A. Factual Background*

1. Prosecution Evidence

At about 1:15 a.m. on November 12, Garden Grove Police Officers Charles Starnes and Troy Haller were dispatched to defendant's neighborhood in response to A.M.'s missing person's call. This was not the first time the officers had been to that neighborhood. Roughly a month earlier, in October 2016, they had been to defendant's house to investigate JD2's allegations that defendant had kidnapped and sexually assaulted her after taking her to a Home Depot store in Garden Grove.

13

On this occasion, however, Starnes and Haller were investigating a different matter, namely the whereabouts of JD1. As noted in the statement of facts above, JD1's boyfriend A.M. had reported her missing because she was not answering her phone and he did not know where she was. Although A.M. had managed to track JD1's phone to the area around defendant's house, he did not know exactly where the phone was, or how to retrieve it in the middle of the night, which is why he called the police.

When Starnes and Haller arrived at the scene, they spoke with A.M. about his concerns. A.M. said that despite repeated attempts to contact JD1, he had not heard from her in about eight hours. He was worried about her because she had children to care for, and it was not like her not to answer her phone, or at least return his calls.

According to the locator app on A.M.'s phone, JD1's phone was in close proximity to defendant's house. The officers instructed A.M. to keep calling the phone, in the hope that they would hear it "pinging" in the area. They then began knocking on doors to see if anyone in the neighborhood had seen JD1 or heard her phone. When they got to defendant's house, L.M. answered the door alone. The officers told her they were looking for a missing person whose phone was in the area, and she said she had heard a pinging sound coming from the rear of her residence.

Following that brief encounter with L.M., Starnes and Haller went back and talked to A.M. By then, Garden Grove Police Officer Aldo Guereca had also arrived on the scene. Like Starnes and Haller, Guereca knew that defendant had previously been investigated for kidnapping and sexually assaulting JD2. In fact, Guereca was part of the team that had arrested defendant at his house in connection with that earlier incident, in October 2016. The officers decided to have Starnes stay with A.M. and

14

monitor his phone, and for Haller and Guereca to go back to defendant's house to see if L.M. would let them enter her backyard to look for JD1's missing phone.

During this second contact, L.M. reiterated that she had heard a pinging sound coming from the rear of her residence. She also stated that she and defendant had been to Walmart earlier that evening. Haller asked if he could go into her backyard to look for the phone, and she said yes or something to that effect.

Haller walked to the side of the house and looked over a wall into the backyard, where he saw defendant running from the rear of the yard toward the back of the house. Haller yelled out to him, identifying himself as a police officer, and in response, defendant stopped running and joined him by the wall. When Haller asked him what he was doing, defendant said his girlfriend had heard a phone pinging in their backyard, so he went to check it out. Although he was not happy about the police being at his house, he eventually allowed Haller to enter his backyard to look for the phone.

Guereca also entered the backyard around this time. He stayed with defendant and L.M., while Haller walked to the rear fence to investigate. While looking over the fence into the adjoining backyard, Haller heard a pinging sound coming from that location. He radioed Officer Starnes to let him know where the sound was coming from. Then he jumped the fence and met Starnes on the other side. Within minutes, they found JD1's pinging phone, along with her other phone. The phones were located inside a plastic Walmart bag in the backyard of defendant's rear neighbor.

While Haller and Starnes were tracking down the phones, defendant told Guereca he was uncomfortable with the police being on his property and asked him to leave. Guereca walked over to a side gate that

15

leads to defendant's front yard and radioed Haller his location. He remained there for several minutes as defendant and L.M. returned to their home.

Before long, Haller returned to defendant's house and met up with Guereca at the side gate. Given all of the circumstances, Haller was concerned that A.M.'s girlfriend, i.e., JD1, might be inside defendant's residence and in need of help. He wanted to speak with defendant and L.M. about allowing him to enter their home to look for her.

The conversation about entering the home occurred at defendant's back sliding door, while Officers Guereca and Haller were standing in the backyard, and defendant and L.M. were standing inside their house. When Haller said he would like the enter the house to search for A.M.'s girlfriend, defendant and L.M. became agitated. L.M. said she had been willing to cooperate with the officers up until that point, but now she was tired and wanted to go to bed. And defendant indicated he was worried about the officers planting evidence in his home.

Haller told defendant that was not going to happen. He assured defendant and L.M. that he did not want to conduct an extensive search of their home but merely wanted to make sure A.M.'s girlfriend was not inside. In making his pitch for entry, Haller also asked defendant and L.M. to consider how they would feel if one of their relatives were missing. He told them, "The best way to get us (the police) out of your hair right now is [to] make sure nobody's in the house."

L.M. replied, "No way . . . I can't help you[.] I can't do it." She insisted that no one else was in the home, and so did defendant. However, during the back and forth, defendant told Haller, "I'll make you a deal" and alluded to the prospect of Haller getting a supervisor to conduct the search. Defendant also indicated that the officers could come in if they allowed him to

16

accompany them during the search. Although Haller rejected that idea for officer safety reasons, he said L.M. could follow him around the house during the search if she wanted to. Haller also told defendant, "We're not trying to get anybody. We're going to come in. We would like to do it cooperatively[.]" At that point, defendant said alright, fine and let the officers into his house.

Once inside, Guereca took defendant into the living room, and L.M. followed Haller as he conducted a protective sweep around the house in search of JD1. As it turned out, the sweep turned up empty, as no one else was in the house. However, that did not bring an end to the encounter because right after Haller completed the protective sweep, new information came to light.

It just so happened that while Guereca and Haller were inside defendant's house carrying out the protective sweep, JD1 called A.M., who was still standing by with Officer Starnes outside the house. Starnes spoke to JD1 on A.M.'s phone to see if she was okay. She reported that she had been sexually assaulted in Westminster earlier that evening by a white man with tattoos who was driving a red Chevy El Camino. Because defendant fit that description and there was just such a vehicle parked outside his home, Starnes directed Haller to detain defendant as a possible suspect in JD1's attack.

That made defendant upset. He told Haller, "We let you into this house under the assumption you were going to search the house," and now that you are done, "We're asking you to leave." However, based on the new information from Officer Starnes, Haller and Guereca detained defendant and L.M. at their home pending further investigation.

Because the incident involving JD1 occurred in Westminster, police officers from that city were called to the scene. At about 2:30 a.m.,

17

defendant agreed to speak to them in his front yard. He was not handcuffed at that time, but he was informed that he was being detained.

Defendant admitted to the officers that there was a gun in his house. When asked if the police could search his car and bedroom, defendant said they could search "all day long[.]" At one point, he also gave the officers broader permission to search the entire house.

However, after defendant was arrested and taken into custody, the police spoke to L.M., as well as her mother, who owned the house and had arrived there from work in the early morning hours following defendant's arrest. Because L.M. and her mother both declined a request to search, the police began the process of obtaining a warrant to search the house.

Meanwhile, the police contacted defendant for further questioning at the police station. After waiving his *Miranda* rights, he again consented to a search of his car and bedroom. He also called L.M. and told her it was okay for the police to search the house. Although L.M. had previously refused to give consent to search, defendant told her to sign the officers' consent-to-search form, and that is what she did. Her mother also gave written consent to search the house. At that point, the police stopped working on the search warrant application and searched the house, which led to the discovery of the handgun in defendant's garage.

2. Defense Evidence

L.M. testified that she did not give the officers permission to enter her backyard when they initially asked her to do so. However, she

eventually capitulated and gave in to them because they were being persistent and she was greatly outnumbered.[4]

L.M. also testified about the situation that unfolded at her back sliding door after the police found JD1's phones. She claimed that she and defendant repeatedly told the officers they did not want them coming into their house, but they said they had the right to enter and were going to do so anyway. According to L.M., the officers also tried to open the sliding door at that time, but it was locked. Then they told her that she needed to open the door. Fearing the officers were going to break it down, L.M. opened the door and allowed them inside.

Upon entering, the officers said they were going to look around the house to see if anyone else was present. Although L.M. and defendant objected to that, the officers told them that did not matter and proceeded to search the house. After that, the police detained L.M. inside the house for several hours before eventually taking her outside and asking if they could search the house. L.M. refused to give her consent at first, but after defendant called her and gave her the okay, she had a change of mind. By that point, L.M. had been outside for quite some time and was concerned about not being able to access certain medications that were inside the house. In light of all the circumstances, she signed the consent form at about 10:30 a.m.

B. Trial Court's Ruling

Defendant's suppression motion focused on the officers' initial entrance into his home to search for JD1. Although that search did not turn

---

[4] L.M. was unable to recall how many officers were present when she answered her door, but she testified that it felt like there were four or five of them.

19

up any incriminating evidence, defendant argued it tainted any subsequent consent that was given to search his house.

The trial court ruled by minute order. As a preliminary matter, it found the police had consent to enter defendant's backyard to look for JD1's phone. Although L.M. testified her consent was coerced, the court "did not find her testimony credible as to the issues she testified to."

The court also found the police had consent to enter defendant's home through the back sliding door after finding JD1's phones. While recognizing that defendant and L.M. balked at the officers' initial requests to open the door, and the officers were somewhat persistent about coming in, the court did not believe the situation was so hostile, threatening or coercive as to render defendant's consent to enter involuntary.

Assuming otherwise, the court ruled the officers' entry into defendant's house was justified under the exigent circumstances exception to the warrant requirement. In fact, based on all of the information available to the officers, the court concluded they would have been derelict in their duties if they had not entered defendant's house to look for JD1.

Furthermore, the court found that even if the officers' initial entrance was illegal, the taint from that illegality was attenuated by the subsequent consent to search that was given by defendant, L.M. and her mother. And, irrespective of that, the police had an independent basis to search the house through the search warrant process. Therefore, the evidence they found during the search would have been admissible under the inevitable discovery doctrine. For all these reasons, the court denied defendant's motion to suppress that evidence.

20

*C. Standard of Review*

"In reviewing the denial of a suppression motion, we consider the record in the light most favorable to the disposition and defer to the court's factual findings if supported by substantial evidence. [Citation.] Any conflicts in the evidence are resolved in favor of the court's order. [Citation.]" (*People v. Mathews* (2018) 21 Cal.App.5th 130, 137.) Construing the evidence in that deferential light, we then "independently assess, as a matter of law, whether the challenged search or seizure conforms to constitutional standards of reasonableness." (*People v. Hughes* (2002) 27 Cal.4th 287, 327.)

D. *Consent*

Consent is a well-recognized exception to the warrant requirement that may be given in direct express terms, or by implication. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219; *People v. Robles* (2000) 23 Cal.4th 789, 795; *People v. Frye* (1998) 18 Cal.4th 894, 990, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) However, consent may not be the product of coercion. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 550.) Thus, when the legality of a search turns on the issue of consent, the prosecution must prove not only that the necessary consent was given, but that it was freely and voluntarily offered, meaning it was not obtained by threats or force, or granted in submission to a claim of lawful authority. (*Florida v. Royer* (1983) 460 U.S. 491, 497; *People v. Boyer* (2006) 38 Cal.4th 412, 445–446.)

Defendant does not challenge the legality of the officers' actions in entering his backyard. However, he contends the officers lacked consent to enter his home through the backdoor slider to look for JD1. In defendant's view, express consent was never given, and any implied consent was merely a submission to the officers' claim of lawful authority.

21

Actually, though, the record reflects that defendant did give his verbal consent for the officers to enter his home. He can be heard on the recording of Guereca's body microphone saying "alright . . . fine" and "[c]ome on" in, in response to the officers' repeated requests to enter. But that was *after* defendant had already asked the officers to leave his property, and after he and L.M. had made it clear that they did not want the officers to enter their home. The fact that defendant gave his consent in response to repeated and persistent requests for entry suggests it was not freely and voluntarily given. (*United States v. Clark* (D.V.I. 2019) 2019 WL 3456813 [defendant's consent found involuntary where it "constituted mere acquiescence to the officers' repeated requests"]; *State v. Garcia* (Kan. 1992) 827 P.2d 727 [same where the defendant "was subjected to repeated requests by the trooper for permission to search"]; *State v. Diede* (Minn. 2011) 795 N.W.2d 836, 848 [consent given in response to dogged police questioning deemed invalid].)

It is true that defendant offered to make a "deal" with the officers in regard to letting them come inside his house. His proposal was for Officer Haller to get a supervisor to conduct the search, or for Haller to let him (defendant) accompany him during the search. However, Haller did not accept either one of those proposals. Instead, he offered to let L.M. follow him around during the search. He also told defendant, "We're going to come in. We would like to do it cooperatively[.]" This implied the officers were prepared to enter the house forcefully if defendant did not agree to let them in. It was immediately after this implied threat that defendant gave the officers permission to enter his house.

On this record, it is hard to tell whether defendant consented in response to Haller's offer to let L.M. accompany him during the search, which would favor a finding defendant's consent was voluntary, or whether he

22

consented because the officers told him they were going to come in regardless of what he said to them, which would favor a contrary finding. The trial court did not make any findings in regard to that particular issue. Instead, it focused on what defendant and L.M. said *after* the officers entered their home, in finding the officers had consent to enter.

In that regard, the trial court found it significant that defendant and L.M. expressed regret for letting the officers into their home, once they realized the officers were not going to let them go in the wake of the search. However, the fact defendant and L.M. expressed what the trial court described as "buyer's remorse" after letting the police into their home does not speak to the circumstances under which consent was given in the first place.

If the circumstances indicated that resistance to the officers' repeated requests to enter the home would be futile, which is what Haller's statement "[w]e're going to come in" strongly implied, it would be hard to characterize defendant's consent as being free and voluntary. Indeed, courts have been reluctant to find a suspect's consent valid when it was given under similar circumstances. (See, e.g., *Gregg v. Ham* (4th Cir. 2012) 678 F.3d 333, 342 [consent to enter deemed involuntary because, inter alia, the requesting authorities told the resident that if she did not let them in, they were going to come in anyway]; *United States v. Allen* (N.D. Cal. 1972) 349 F. Supp. 749, 752 [consent deemed involuntary where although the defendant "ultimately uttered words of assent to the request by the officers to open the bag, his acquiescence came only after repeated requests by the agents accompanied by references to the inevitability of a search by the local authorities"]; *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 832-833 [consent will be deemed involuntary if it was given in response to an officer's suggestion that it would

be fruitless or unwise to decline a request to search]; *Campos v. State* (Ind. 2008) 885 N.E.2d 590 [by telling the defendant that the search was necessary, the police effectively conveyed to him that he had no real choice in the matter]; *State v. Johnson* (Wis. 2007) 729 N.W.2d 182 [defendant's consent deemed involuntary where it was preceded by an officer's statement indicating the police were going to search his vehicle].)

However, we need not decide whether the officers had lawful consent to enter defendant's home. That is because, as we now explain, their entry was clearly justified under the exigent circumstances exception to the warrant requirement. (See *United States v. Murray* (N.D.W.V. 2022) 2022 WL 356352 [officers did not need consent to undertake warrantless search where exigent circumstances for the search existed].)

*E. Exigent Circumstances*

Under the exigent circumstances exception, a warrantless search is permitted "[w]hen there is a compelling need for official action and no time to secure a warrant[.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 580, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Although the parameters of the exception defy precise description, a warrantless entry into a suspect's home will be upheld so long as "the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate. [Citation.]" (*People v. Rogers* (2009) 46 Cal.4th 1136, 1157.) This includes the situation where there is "probable cause to believe that a person reliably reported missing is within" the home and in need of aid. (*People v. Coddington, supra,* 23 Cal.4th at p. 580.)

In this case, when the officers entered defendant's home to search for JD1, they were aware of the following facts: 1) defendant had been

arrested about a month earlier for kidnapping and sexual assault; 2) A.M. was very concerned about JD1's welfare because he had not been able to get a hold of her for eight hours, and it was unlike her not to return his calls or neglect the care of her children; 3) A.M. reported JD1's phone was located in the vicinity of defendant's house; 4) while the officers were looking for the phone, they saw defendant running in his backyard; 5) soon thereafter, the officers found JD1's phones in the backyard of defendant's rear neighbor; and 6) the phones were located inside a bag from a store (Walmart) that defendant had been to earlier that evening.

Based on these circumstances, it was reasonable for the officers to believe that defendant discarded JD1's phones in his neighbor's backyard in response to the police arriving at his residence. Defendant obviously did not want the police to find the phones or know they had been in his possession. Attempting to hide a missing person's phones is suspicious in its own right. But factoring in defendant's recent arrest for kidnapping and sexual assault, it is easy to see why the officers were concerned that defendant may have done something more than simply steal a missing person's phones. Given everything the officers knew about defendant's criminal history and his connection to the phones, they had good reason to believe that JD1 might be inside his home and in need of emergency assistance.

This is true regardless of the fact that the police did not know whether JD1 was in danger, or whether defendant had ever threatened her. Nor does it matter that the officers did not hear any suspicious noises consistent with a woman being held against her will inside defendant's home. Defendant argues a warrantless search of his home was unjustified absent such evidence. But the police "do not need ironclad proof of a 'likely serious,

life-threatening' injury" to enter a home under the exigent circumstances exception. (*Michigan v. Fisher* (2009) 558 U.S. 45, 49; *People v. Troyer* (2011) 51 Cal.4th 599, 602.)

When a woman is reported missing to the police, it always raises the specter of foul play. And given defendant's recent arrest for serious sexual misconduct and his highly suspicious conduct respecting JD1's phones, the police had every right to believe he might have taken JD1 inside his home against her will. (*Dempsey v. Gibson* (9th Cir. 2023) 2023 WL 2064546 [citing the defendant's deceptive conduct as a factor justifying the warrantless entry into his room under the exigent circumstances doctrine].) Therefore, the officers were justified in entering defendant's home to look for her. (*People v. Rogers, supra,* 46 Cal.4th at p. 1157 [noting that even in the absence of obvious signs of distress, a warrantless entry may be appropriate to look for a person who has been reliably reported as missing and may be in need of help]; *People v. Panah* (2005) 35 Cal.4th 395, 465-466 [upholding the warrantless search of defendant's apartment to look for a person who had been missing for several hours]; *People v. Lucero* (1988) 44 Cal.3d 1006, 1017 [perceived danger to missing children justified warrantless entry and search]; *People v. Hochstraser* (2009) 178 Cal.App.4th 883 [concern over missing woman's safety justified warrantless police entry into the defendant's home].)

Defendant argues that even if exigent circumstances existed at the time the officers entered his home to look for JD1, they ceased to exist once Officer Starnes spoke to JD1 and learned that she was safe. That may be true, but in speaking with Starnes, JD1 reported that she had been sexually assaulted earlier that evening by a man who looked like defendant and who drove the same type of car that was parked outside his home. The receipt of this new information, coupled with all of the other attendant

26

circumstances, fully justified defendant's detention pending further investigation. (See generally *In re Tony C.* (1978) 21 Cal.3d 888, 894 [a suspect's detention is permissible when the police have reasonable suspicion he or she has engaged in criminal activity].) The police were not required to let defendant go the instant they learned that JD1 was no longer in danger.

And, of course, once defendant, L.M. and L.M.'s mother consented to a search of their home, the police were fully justified in searching it without a warrant. Defendant argues their consent was tainted by the officer's initial entry to look for JD1. But, as we have explained, that entry was permissible under the exigent circumstances exception. Because there was no illegality to begin with, defendant's tainted-consent argument lacks merit. (*United States v. Sandoval-Vasquez* (7th Cir. 2006) 435 F.3d 739, 744; *People v. Panah, supra,* 35 Cal.4th at p. 466.)

Therefore, we need not consider whether the alleged taint was attenuated by other circumstances, or whether the gun found inside defendant's garage would inevitably have been discovered through other lawful means. As there was no violation of defendant's Fourth Amendment rights, the trial court properly denied his motion to suppress.

II.

SEVERANCE MOTION

Defendant contends the trial court also erred in denying his motion to sever the charges involving JD1 from the charges involving JD2. That motion was litigated in conjunction with the prosecution's request to give CALCRIM No. 1191B on the use of propensity evidence, which we discuss in the next section of our opinion. Therefore, we will combine the background section for these two related issues.

*A. Procedural Background*

Defendant filed extensive points and authorities in support of his request for separate trials as to each victim. As a threshold matter, he argued the statutory requirements for joinder were not satisfied because, in his view, the alleged offenses against JD1 and JD2 were not connected together in their commission or of the same class of crime, nor were they merely different statements of the same offense. (See § 954.)

Alternatively, defendant argued severance was required because trying all of the charges together in a single trial would create a substantial danger of undue prejudice. His prejudice argument rested on the assumption that the evidence pertaining to the alleged attacks was not cross-admissible and that "joinder of the charges would result in the admittance of additional prejudicial evidence in each of the cases, allowing two weak cases to be combined in order to create one seemingly stronger case."

In its opposition papers, the prosecution disputed both aspects of defendant's argument. It maintained joinder was proper under section 954, and it would not cause undue prejudice because, among other things, the evidence as to each of the victims was cross-admissible under Evidence Code sections 1101, subdivision (b), and Evidence Code section 1108.

In conjunction with its opposition motion, the prosecution requested the court to give CALCRIM No. 1191B, which allows jurors to consider the defendant's charged sexual offenses as evidence of his propensity to commit other charged sexual offenses. The prosecution argued that instruction was a logical extension of Evidence Code section 1108, which authorizes the use of propensity evidence in sex crime cases.

At the hearing on these issues, the trial court ruled the incident regarding JD1 and the incident regarding JD2 involved the same class of

28

crimes because both incidents were sexually motivated and characterized by violent assaultive behavior. Therefore, the severance issuance and the instructional issue came down to the question of cross-admissibility and fundamental fairness. Relying on Evidence Code section 352 and due process, defense counsel argued that trying all of the charges together would inflame the jury and create an uneven playing field for his client. However, the trial court disagreed. It determined any inference of prejudice was negated because the evidence as to each incident was cross-admissible pursuant to Evidence Code section 1108. It thus denied defendant's severance motion.

The court then turned to the instructional issue, at which time defense counsel renewed his Evidence Code section 352 and due process objections. Counsel simply did not think it was fair to allow the jury to use the evidence as to one victim to prove the charges against the other victim. But the court, having listened to all the arguments and having read the parties' extensive briefing on the issue "two or three times," ruled that CALCRIM No. 1191B was "probably . . . an appropriate instruction." And ultimately, it did give that instruction to the jury.

B. Standard of Review

"In reviewing whether the trial court improperly denied a defendant's motion to sever, "'we apply the familiar standard of review providing that the trial court's ruling may be reversed only if the court has abused its discretion. [Citations.] An abuse of discretion may be found when the trial court's ruling "'falls outside the bounds of reason.'"' [Citations.] Defendant has the burden of showing error in denial of a motion to sever and does so only on a clear showing of prejudice to establish the trial court abused its discretion. [Citation.]" (*People v. Johnson* (2015) 61 Cal.4th 734, 750.)

29

*C. Applicable Law*

In the interest of judicial economy, there is a preference that all charges against a defendant be handled in one proceeding. (*People v. Capistrano* (2014) 59 Cal.4th 830, 848.) Joinder of charges "ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials. [Citations.]" (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.) Joinder also speeds up the disposition of criminal charges. (*People v. Bean* (1988) 46 Cal.3d 919, 940.)

To that end, section 954 permits joinder in a variety of situations, including when the accusatory pleading charges two or more offenses that are of the same class of crime or were connected together in their commission. If the statutory criteria for joinder have been met, "the burden is on the party seeking severance to establish clearly that a substantial danger of prejudice exists requiring that the charges be tried separately. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 985.) Prejudice may arise where the evidence related to the charges to be tried would not be cross-admissible in separate trials, some of the charges are unusually likely to inflame the jury against the defendant, or a weak case has been joined with a strong case. (*Ibid.*)

*D. The Charges Were Properly Joined*

For purposes of section 954, criminal offenses are "of the same class," and thus subject to joinder, when they share common characteristics or attributes. (*People v. Landry* (2016) 2 Cal.5th 52, 76; *People v. Carson* (2003) 109 Cal.App.4th 978, 990.) Defendant admits the desire for sexual gratification was a common characteristic of the crimes he was accused of committing, and that sex crimes are typically considered to be of the same

class. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1113.) However, he argues the crimes against JD1 and JD2 were carried out in such a dissimilar manner that they should not be deemed to be of the same class.

In so arguing, defendant correctly notes that the crimes against JD2 involved a ruse, a knife and handcuffs, whereas the crimes against JD1 involved an ambush and a gun. But by focusing on these particular factual differences, defendant overlooks the broader common circumstances that link these two criminal episodes. Namely, that they were both sexually motivated, assaultive in nature, and carried out with a deadly weapon. As the trial court rightly found, these shared characteristics were sufficient to satisfy the same-class-of-crimes requirement. (*People v. Landry, supra,* 2 Cal.5th at p. 76; *People v. Ochoa* (1998) 19 Cal.4th 353, 409; *People v. Lindsay* (1964) 227 Cal.App.2d 482, 492.) Therefore, all of the charged offenses were joinable under section 954.

*E. Joinder Did Not Create a Substantial Danger of Prejudice*

Turning to the issue of prejudice, we must keep in mind that of all the various factors noted above, "[c]ross-admissibility is the crucial factor affecting prejudice." (*People v. Stitely* (2005) 35 Cal.4th 514, 531.) "Where evidence would have been cross-admissible in separate trials, . . . '"any inference of prejudice is dispelled."' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 222.)

In this case, the trial court determined the crimes involving JD1 and the crimes involving JD2 would have been cross-admissible in separate trials pursuant to Evidence Code section 1108. Although evidence of uncharged offenses—sometimes called character or propensity evidence—is generally prohibited in criminal trials, that section states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the

31

defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] [s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352." (Evid. Code, § 1108, subd. (a).) This provision was specifically enacted "to expand the admissibility of disposition or propensity evidence in sex offense cases." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.)

Since defendant was accused of committing sex crimes against both his victims, the only potential obstacle to cross-admissibility would have been Evidence Code section 352. That section empowers the trial court to exclude evidence if its probative value is substantially outweighed by the probability its admission would cause undue prejudice. This weighing process is highly discretionary; a trial court's decision to admit or exclude evidence under Evidence Code section 352 will only be disturbed if it is arbitrary, capricious or patently absurd. (*People v. Kelly* (2007) 42 Cal.4th 763, 783; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; *People v. Soto* (1998) 64 Cal.App.4th 966, 984-985.)

While admitting this deferential standard of review applies in most cases involving Evidence Code sections 1108 and 352, defendant claims it should not govern here because the trial court did not *expressly* balance the probative value of cross-admissibility against the potential prejudice it might cause. However, an express, on-the-record assessment and weighing of the pertinent factors is not required. (*People v. Catlin* (2001) 26 Cal.4th 81, 122.) Rather, it is sufficient if the record shows the trial court understood and fulfilled its responsibility under Evidence Code section 352, which is simply to weigh the probative value of the proffered evidence against its potential prejudicial effect. (*People v. Williams* (1997) 16 Cal.4th 153, 214.)

Such is the case here. The parties' briefing on the joinder issue—which the trial court read multiple times—included numerous references to Evidence Code sections 1108 and 352. And at the hearing on that issue, defense counsel reiterated he was relying on Evidence Code section 352 and the lack of cross-admissibility as the basis for opposing joinder. It was abundantly clear from his remarks that he felt the prejudicial impact of joinder outweighed the probative value of trying all the charges in a single trial. Under these circumstances, we may infer the court engaged in the requisite weighing process and made an informed decision on the issue of cross-admissibility. (*People v. Padilla* (1995) 11 Cal.4th 891, 924.) Therefore, the abuse-of-discretion standard applies in reviewing that decision.

Anticipating that could be the case, defendant contends the trial court abused its discretion under Evidence Code sections 1108 and 352 in determining the evidence as to each victim was cross-admissible as to the other. While admitting the charged offenses had a common sexual theme to them, he claims the episode involving JD1 was so factually, temporally and geographically distinct from the episode involving JD2 that any probative value of cross-admissibility was substantially outweighed by the prejudicial impact of allowing the jury to consider both episodes together in assessing the truth of the charges.

To be sure, defendant's two attacks were temporally and geographically distinct. However, they were only separated by a few weeks and a few miles. Compared to other cases which have addressed this issue, they were not so disconnected from one another as to render the probative value of cross-admissibility insignificant. (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41 [upholding the admission of evidence regarding a 15-year-old sexual offense]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285

33

[30-year-old sexual offense not unduly remote or prejudicial under Evidence Code section 352].)

As for the factual differences between the two episodes, defendant asserts, "[a]n elaborate ruse ending in a sexual assault," which is how he describes the incident involving JD2, "is fundamentally different than a prostitution negotiation . . . gone bad," which is how he describes the incident involving JD1. However, JD1 testified that defendant confronted her with his gun, demanded her to take off her clothes, and threatened to kill her right when he entered her room. There was no negotiating for anything under her version of events.

Moreover, contrary to defendant's understanding, similarity between the two episodes is not required under Evidence Code section 1108. (*People v. Frazier, supra,* 89 Cal.App.4th at pp. 40-41.) Indeed, courts have recognized that imposing a similarity requirement would undermine the purpose of the statute and ignore the fact many sex offenders are not specialists in terms of the crimes they commit. (*People v. Soto, supra,* 64 Cal.App.4th at p. 984.) We are satisfied the circumstances surrounding the two sexual assaults that defendant committed were sufficiently alike to support the conclusion he had a propensity to engage in sexual misconduct.

In that regard, it is telling that during both assaults defendant utilized threats and a weapon in attempting to gain compliance from the victim, he pulled the victim's hair, he demanded the victim to orally copulate him, and he kissed and groped the victim without her consent. Defendant also subjected both victims to a frightening level of physical violence, yet neither assault was particularly more inflammatory than the other. So, the danger of the jury being emotionally swayed to convict defendant across the board based solely on the evidence of one assault or the other was very low.

34

(Compare *People v. Harris* (1998) 60 Cal.App.4th 727, 738-741 [evidence of the defendant's prior sex offense should have been excluded because it was much more inflammatory and violent than the charged sex crimes].)

For all these reasons, we find no abuse of discretion in the trial court's finding on cross-admissibility. And because the evidence regarding one assault was admissible to prove the other, there is no reason to question the court's decision to try all of the charges in a single trial. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [cross-admissibility dispels any inference of prejudice].)

As a fallback argument, defendant contends that even if the trial court did not err in denying his severance motion at the time it was heard, the subsequent joint trial was so fundamentally unfair that it violated his right to due process of law. (See *People v. Landry, supra,* 2 Cal.5th at p. 77.) In so arguing, defendant renews his claim that the evidence pertaining to the two attacks was not cross-admissible. However, for the reasons explained above, we find that claim unpersuasive.

We also reject defendant's claim that joinder impermissibly allowed the prosecution to bootstrap a weaker case with a stronger case. Granted, the charges involving JD1 might have been a little harder to prove in comparison to the charges involving JD2, because JD1 was working as a prostitute at the time of her encounter with defendant, and she did not have any significant injuries to substantiate her claim that defendant physically assaulted her. But, JD1 was clearly rattled when the police interviewed her at the scene, and the nurse who examined her testified it is not uncommon for sexual assault victims to lack outward signs of their abuse. JD1's allegations were also corroborated by the fact that a gun was found in defendant's garage.

35

On the other hand, defendant lied to the police so often during his police interviews that his claim of innocence likely carried very little weight with the jury. It is not just that he lied with respect to one episode or the other. Rather, as respondent puts it, defendant lied "[a]t every turn" during his police interviews, thus evidencing a consciousness of guilt as to all of the charges. Defendant's clumsy attempt to dispose of JD1's phones was also a glaring sign that his encounter with JD1 involved more than a simple misunderstanding over the price he was willing to pay to have sex with her.

Suffice it to say, the relative strength of the evidence as to the victims was not so disparate as to create an undue danger of prejudice by virtue of a joint trial. Whether considered at the time it was made, or in light of the evidence adduced at trial, the court's denial of defendant's severance motion did not render his trial unfair or violate due process. (See *People v. Merriman* (2014) 60 Cal.4th 1, 41-43 [upholding the denial of the defendant's motion to sever sexually related charges involving different victims]; *People v. Nguyen, supra,* 184 Cal.App.4th at p. 1114 [same].)

III.

PROPENSITY INSTRUCTION

Defendant also contends the trial court committed reversible error by instructing the jury with CALCRIM No. 1191B on the permissible use of propensity evidence. Again, we disagree.[5]

---

[5] Respondent argues defendant forfeited his right to challenge the giving of CALCRIM No. 1191B because although he objected to the instruction before trial, he did not renew his objection later on, during the evidentiary phase of the trial. However, because the instruction arguably violated defendant's right to a fair trial, we will entertain his challenge to it. (§ 1259 [a jury instruction impacting the defendant's substantial rights is reviewable on appeal even if he did not object to it at trial].)

36

*A. Procedural Background*

As explained in the previous section, the trial court adjudicated the instructional issue in conjunction with defendant's severance motion. After finding the evidence as to each victim was cross-admissible, the court granted the prosecution's request to give CALCRIM No. 1191B. Pursuant to that instruction, the jury was told:

"The People presented evidence that the defendant committed the crimes of Sexual Penetration by Foreign Object and Force as charged in Counts 1 and 2; Forcible Rape as charged in Count 3; Forcible Oral Copulation as charged in Count 4; Assault with Intent to Commit Sexual Offenses as charged in Counts 5 and 8; Kidnapping to Commit Sex Offenses as charged in Count 7; Attempted Forcible Oral Copulation as charged in Count 9; and Sexual Battery by Restraint as charged in Count 10. Please refer to the separate instructions that I will give you on those crimes.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but you are not required to, conclude from that the evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

37

*B. Analysis*

In challenging this instruction, defendant concedes the California Supreme Court upheld a materially similar instruction in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*). Although Evidence Code section 1108 is typically used in sex crimes cases to introduce evidence of *uncharged* sex crimes, *Villatoro* determined "nothing in the language of [that] section . . . restricts its application to uncharged offenses." (*Id.* at p. 1164.) To the contrary, Evidence Code section 1108 was broadly intended to allow the jury to consider any evidence of the defendant's propensity to commit sex crimes. (*Ibid.*) Therefore, *Villatoro* held it was permissible for the jury to consider the defendant's charged sex offenses in deciding whether he committed other charged sex offenses. (*Ibid.*)

Despite this holding, defendant urges us not to follow *Villatoro* for several reasons. First, as a foundational matter, defendant maintains the trial court failed to undertake the necessary weighing process under Evidence Code section 352 in finding the charged offenses were cross-admissible under Evidence Code section 1108.

However, as we explained in the previous section, the parties' written and verbal arguments highlighted the importance of Evidence Code section 352 on the issue of cross-admissibility, which was the pivotal issue in terms of the trial court giving CALCRIM No. 1191B. Although the trial court did not explicitly explain its reasoning under that section, "an express statement" of reasons was not required. (*Villatoro, supra,* 54 Cal.4th at p. 1168.) Based on the extensive briefing and argument the parties presented on the Evidence Code 352 issue, we are satisfied the trial court implicitly conducted the necessary analysis under that section. (*Ibid.*)

Defendant also argues that *Villatoro* was wrongly decided because an instruction like CALCRIM No. 1191B undermines the presumption of innocence and impermissibly allows the jury to make a guilty finding based on a lesser standard than proof beyond a reasonable doubt. However, as a lower appellate court, we are not at liberty to disregard the Supreme Court's decision in *Villatoro*, which held to the contrary. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68.) Like the instruction in *Villatoro*, CALCRIM No. 1191B "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Villatoro, supra*, 54 Cal.4th at pp. 1167-1168.) As such, the instruction did not lower the standard of proof or violate defendant's rights in any respect. (*Ibid.*)

IV.

SENTENCING

Lastly, the parties agree, as do we, that the trial court erred in sentencing defendant to a full consecutive sentence of three years for attempted forcible oral copulation on count 9. In so doing, the trial court appears to have applied section 667.6, subdivision (d), which requires a full consecutive term for certain sex offenses. However, that provision does not apply to *attempted* sex offenses. (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 217.) Therefore, we will reverse defendant's sentence on count 9 and remand for limited resentencing. (*People v. Le* (1984) 154 Cal.App.3d 1, 11, disapproved on other grounds in *People v. Piper* (1986) 42 Cal.3d 471, 477, fn. 5.)

## DISPOSITION

Defendant's sentence for attempted forcible oral copulation in count 9 is reversed, and the matter is remanded for resentencing on that count. In all other respects, the judgment is affirmed.


DELANEY, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

40